FILED
2023 Jun-22  PM 05:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| **MERCEDES-BENZ, US** ) | |
| **INTERNATIONAL INC., et al** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 7:22-cv-00257-ACA** |
| ) | |
| **INTEVA PRODUCTS LLC, et al** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

When a fire broke out at Defendant Magnesium Products of America's ("MPA") manufacturing facility, its production of magnesium cross-car beams halted. The cessation of production impacted its contract with Defendant Inteva Products, LLC, who used the beams to manufacture cockpits for cars produced by Plaintiff Mercedes-Benz U.S. International, Inc., ("MBUSI"). At the time of the fire, MBUSI had an insurance policy with HDI Global Insurance Company.

To ensure MBUSI secured production capacity at MPA's manufacturing facility as it recovered from the fire, the parties executed a purchase order in June of 2018 (the "post-loss purchase order"). The post-loss purchase order required MPA to reserve a certain amount of production capacity for MBUSI's cross-car beams and in exchange, MBUSI was to pay MPA fifteen million dollars. The post-loss purchase

order also included a partial release from liability for any "Supplier" to MBUSI for the fire that limited MBUSI's recoverable damages to one million dollars.

MBUSI and HDI brought this suit against MPA and Inteva asserting damages of thirty-three million dollars against both defendants. MPA has moved for partial summary judgment to enforce the partial release from liability provision in the post-loss purchase order. (Doc. 45). Inteva has moved for summary judgment because its performance was excused (1) under its contract with MBUSI and (2) Alabama law, or in the alternative, partial summary judgment to enforce the partial release from liability provision in the post-loss purchase order. (Doc. 43).

This is not the first time the court has considered these motions. After previously granting in part and denying in part MPA's motion for partial summary judgment and denying Inteva's motion for summary judgment (doc. 75), HDI moved the court to alter, amend, or vacate the order granting partial summary judgment in favor of MPA under Federal Rule of Civil Procedure 59(e) (doc. 76). The court cannot alter, vacate, or amend its order granting in part MPA's motion for partial summary judgment because the order is not a final judgment. *See* Fed. R. Civ. P. 59(e) (permitting a party to file "[a] motion to alter or amend a judgment") (emphasis added). But because an order granting in part a motion for partial summary judgment is an interlocutory order, the court has discretion to reconsider, revise, alter, or amend the order and elects to do so here. Fed. R. Civ. P. 54(b); *see also Hardin v.*

*Hayes*, 52 F.3d 934, 938 (11th Cir. 1995). Having reconsidered the motion to dismiss, the court **VACATES** its earlier opinion (doc. 75) and enters the following in its place:

## I.   BACKGROUND

When approaching a motion for summary judgment, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022) (quotation marks omitted).

MPA manufactured magnesium cross-car beams used in the production of vehicles, including three models made by MBUSI—the GLE and GLS sport-utility vehicles and the GLE coupe. (Doc. 44-1 at 4). MPA was a lower-tier supplier for MBUSI, meaning that following production of the cross-car beams, MPA would ship the beams to Inteva for assembly into cockpits for MBUSI's vehicles. (Doc. 46-1 at 3 ¶ 6; doc. 44-3 at 3–5). As a tier one supplier for MBUSI, Inteva was required to use the cross-car beams supplied by MPA, as well as other parts produced by other lower-tier suppliers, to manufacture the cockpits and ship them to MBUSI's vehicle production facility in Alabama. (Doc. 46-1 at 3 ¶ 6; doc. 44-1 at 4; doc. 44-3 at 3–5).

At the time, MPA was the only cross-car beam supplier for MBUSI and Inteva was the only supplier of finished cockpits for the GLE and GLS sport-utility vehicles and the GLE coupe. (Doc. 51-4 at 3). MBUSI required Inteva to source the cross-car beams for their cockpits from MPA, Inteva did not have a choice in their supplier. (Doc. 44-13 at 7).

MBUSI, MPA, and Inteva's duties to one another were outlined by a responsibility matrix with different documents governing relations between each party. (Doc. 44-3 at 2–8). MPA and MBUSI entered into a pricing agreement for the cross-car beams. (Doc. 44-5 at 2–5). MBUSI issued a purchase contract to Inteva for the supply of cross-car beams. (Doc. 44-4 at 2–5). Inteva then issued a blanket purchase order to MPA for supply of cross-car beams based on quantity as ordered by MBUSI. (Doc. 44-8 at 2–5). During the relevant period, MBUSI maintained an insurance policy with HDI. (Doc. 57-2).

All relevant contracts MBUSI entered into were made subject to MBUSI's Master Terms Direct Purchasing. (Doc. 44-6; *see* doc. 44-5 at 2; doc. 44-4 at 2; *see also* doc. 44-12 at 2). The Master Terms provide that in case of inconsistencies between its terms and terms contained in other contract documents that have incorporated the Master Terms, the terms in the Master Terms shall prevail. (Doc. 44-6 at 6, 10). Agreements incorporating the Master Terms are governed by Alabama law. (*Id.* at 59). The Master Terms define a "Supplier" as "[t]he legal entity

which has agreed to supply [a] Product to MBUSI in accordance with the Contract

Documents or the legal entity which has agreed to supply products and services to a

Higher Tier and who has agreed, by way of acceptance of a Purchase Contract, or

otherwise, to be bound by the Contract Documents." (*Id.* at 10). The Master Terms

provide that a Supplier's performance is excused in case of a Force Majeure event,

defined in relevant part as

> Any default or delay of performance under the Agreement which is
> (a) beyond the control of [Inteva], and (b) not occasioned by the
> fault or negligence of [Inteva], and (c) which results from . . . fires
> . . . or other natural or governmental causes, which shall not,
> however, include (x) non-performance by [MPA], . . . for reasons
> other than a Force Majeure Event applying [MPA].

(*Id.* at 7, 43).

MPA's production facility was normally covered in magnesium dust. (Doc.

51-5 at 7). Because interactions between water and magnesium cause an explosion,

MPA's production facility has an increased risk for fire. (Doc. 51-2 at 6–7). MPA

offered annual magnesium fire training for firefighters at the facility. (*Id.* at 6).

In May of 2018, MPA's facility suffered a thermal event consisting of a fire

and three explosions that caused a temporary manufacturing shutdown. (Doc. 46-1

at 3, ¶ 7, 10). MPA's facility had a sprinkler system in the magnesium tunnel and at

the time of the second explosion, the fire chief observed flowing water in the pipes

leading to the magnesium tunnel. (Doc. 51-2 at 45, 50). The fire department could

not identify a cause for the first explosion but concluded that "[t]he second and third

explosions were the result of magnesium burning and the fire suppression system" used in the magnesium tunnel. (*Id.* at 50).

The day after the thermal event, Inteva's sales director sent a letter and email to MBUSI's general counsel about the event and explained that "[i]t is Inteva's understanding that the second explosion was catastrophic and resulted in a large hole in the roof of MP[A]'s Eaton Rapids, Michigan plant and significant damage to the casting area there." (Doc. 44-7 at 3). Inteva claimed this served as notice of a Force Majeure event under MBUSI's Master Terms and for MBUSI to "be assured that we are exploring damage mitigation strategies with MP[A] and MBUSI, and we will implement such strategies accordingly." (*Id.* at 2–3).

The same day, MBUSI notified Inteva that it did not classify the thermal event at MPA as a Force Majeure event, stating, "given the high risk of fire at a facility handling magnesium, we disagree that the explosion at MP[A]'s facility was necessarily the result of a Force Majeure Event under the supply agreement that includes the Master Terms." (Doc. 44-10 at 2). Additionally, MBUSI reminded Inteva of the following terms present in the Master Terms: "Pursuant to Section 3.2 of the [Master Terms], Inteva agreed to supply MBUSI with 100% of MBUSI orders for the Product. In addition, pursuant to Section 4.2, Inteva also agreed to take all necessary actions to be able to produce and supply to MBUSI the Product." (*Id.*) (quotation marks omitted).

Following the temporary shutdown of MPA's facility, MBUSI contacted both Inteva and MPA to establish alternative arrangements to reduce the impact of the thermal event on its production capacity. (Docs. 51-7; 51-8). In MPA's initial plan to handle delays caused by the thermal event, it did not allocate domestic or European production capacity for MBUSI in either Phase One or Phase Two of its process to resume operations, instead allocating production to other customers. (Doc. 51-7 at 2). MPA offered MBUSI production capacity at their facility in China, while maintaining domestic production for other automotive companies. (*Id.*; doc. 51-3 at 23–24). As part of the China production plan, MPA informed MBUSI that once the cross-car beam tools were shipped to China, they would likely not return and that MBUSI would be responsible for transportation costs from China. (Doc. 51-7 at 2). MBUSI believed that the process of starting cross-car beam production in China would "stop production for more than 5 weeks." (Doc. 51-8 at 2).

The parties eventually executed the post-loss purchase order in which MPA reserved a certain percentage of its domestic production capacity for MBUSI in exchange for fifteen million dollars. (Doc. 44-12). The heading of the post-loss purchase order indicates that MPA is the recipient of the order and defines a "Supplier" as used in the order as "You." (*Id.* at 2). The post-loss purchase order was "subject to, and made a part of, the Master Terms." (*Id.*) A partial liability release in the post-loss purchase order provided that a Supplier "shall have no liability to

MBUSI for the thermal event for any amount in excess of an amount equal to the contractual penalties coverage limit of [MPA's] Insurance policy." (*Id.* at 4). MPA held a contractual penalties coverage limit of $1,000,000 under its relevant insurance policy. (Doc. 46-3 at 13).

MBUSI and HDI brought this suit against MPA and Inteva alleging breach of contract and asserting a claim for contractual indemnity against both parties, as well as a claim for breach of bailment agreement against MPA. (Doc. 1-1 at 9–17). MBUSI and HDI request thirty-three million dollars in damages. (*Id.* at 11, 15). HDI asserts it is entitled to these funds because "MBUSI made a claim to HDI under its insurance policy for the damages; HDI was obligated to, and did, pay MBUSI for certain portions of the damages that were covered" and has therefore become subrogated to MBUSI's rights against MPA and Inteva. (*Id.* at 8 ¶¶ 29–30).

## II.   DISCUSSION

Entry of summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), or if "a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1334 (11th Cir. 2016) (quotation marks omitted). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotation marks omitted). Courts must "review[] the evidence and draw[] all reasonable inferences in the light most favorable to the non-moving party." *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011).

The court will begin its analysis by addressing MPA's motion for partial summary judgment. Then it will move to address Inteva's motion for summary judgment.

### 1. MPA's Motion for Partial Summary Judgment

In its motion for partial summary judgment, MPA requests that the court cap MBUSI and HDI's potential recovery against MPA at one million dollars. (Doc. 47 at 2–3). MPA also requests an award for its attorney's fees related to the preparation of its motion for partial summary judgment. (*Id.* at 3).

MPA claims this relief is appropriate under the post-loss purchase order, which provides that MPA will "have no liability to MBUSI for the thermal event for any amount in excess of an amount equal to the contractual penalties coverage limit of [MPA's] insurance policy." (*Id.* at 2; doc. 46-2 at 4). The contractual penalties coverage limit of the relevant insurance policy is one million dollars. (Doc. 46-4 at 10–11). MBUSI does not contest that it executed the post-loss purchase order or that it caps MBUSI's recovery from MPA at one million dollars (*id.*), but it contends that

execution of the purchase order constituted economic duress, and thus it should not be enforced (doc. 53 at 14–23).

To establish economic duress, a party must show: "(1) wrongful acts or threats; (2) financial distress caused by the wrongful acts or threats; [and] (3) the absence of any reasonable alternative to the terms presented by the wrongdoer." *Int'l Paper Co. v. Whilden*, 469 So. 2d 560, 562 (Ala. 1985). The defense "of economic duress applies only to special, unusual, or extraordinary situations in which unjustified coercion is used to induce a contract . . . under such circumstances that the victim has little choice but to accede thereto." *Clark v. Liberty Nat. Life Ins. Co.*, 592 So. 2d 564, 567 (Ala. 1992).

Because at trial, it would be MBUSI's burden to establish economic duress, it is also its burden at summary judgment. *See Bazemore*, 827 F.3d at 1334; *Wright Therapy Equip., LLC v. Blue Cross & Blue Shield of Ala.*, 991 So. 2d 701, 708–09 (Ala. 2008) (holding that party opposing summary judgment did not "demonstrate any genuine issue of material facts as to its claim[] of . . . economic duress" so summary judgment was due to be granted). Thus, to survive summary judgment, MBUSI and HDI must establish there is a genuine issue of material fact as to whether the defense of economic duress applies to invalidate the parties' post-loss purchase order. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

To establish the second element of economic duress, financial distress, a party must make more than a showing of mere financial difficulty. *See Ponder v. Lincoln Nat'l Sales Corp.*, 612 So. 2d 1169, 1171 (Ala. 1992). To establish financial distress, a party must provide evidence that it "face[d] serious financial hardship" if it did not agree to the opposing party's terms. *Whilden*, 469 So. 2d at 563.

Assuming that there are questions of fact regarding the first and third element of economic duress, MBUSI and HDI have failed to offer evidence that would establish MBUSI suffered financial distress because of any alleged wrongful act committed by MPA. The party with the burden of proof regarding an issue must cite to portions of the record that establish each element essential to proving its case—it is not the court's burden to scour the record for evidence that would allow a party to survive summary judgment. (Doc. 8 at 16–17, 20) ("While the court reserves the right to consider evidentiary materials that are not specifically referenced in the brief, no party has a right to assume the court will consider such materials.); *see United States v. Adkinson*, 135 F.3d 1363, 1378–80 (11th Cir. 1998). Here, HDI contends that it cited to evidence on pages eleven, seventeen, eighteen, and nineteen of its brief that establishes it would have suffered financial distress if it did not enter into the post-loss purchase order with MPA. (Doc. 77 at 6–7). The court will explain why none of the cited evidence is sufficient to create a question of fact regarding whether MBUSI faced financial distress because of MPA's actions.

There are three pieces of evidence cited on pages eleven, seventeen, eighteen, and nineteen of Plaintiffs' brief in support of their contention that MBUSI suffered financial distress because of MPA's actions. (*See* doc. 53 at 11, 17–19). First, MPA cites to the second deposition transcript of Monica Heath-Bivens (*id.*; doc. 51-6), a former supervisor at MPA who oversaw production lines at MPA's facility (doc. 51-5 at 5). All of Plaintiffs' citations to Ms. Heath-Bivens's testimony are to the first page of her deposition, where Ms. Heath-Bivens testified about a picture of a tunnel in MPA's facility and items located in the tunnel. (Doc. 51-6 at 4; *see* doc. 53 at 11, 17–19). This testimony does not touch on MBUSI's finances during the relevant period.

Second, MBUSI cites to an email drafted by an Inteva employee summarizing a call between MPA, MBUSI, and Inteva employees. (Doc. 53 at 11, 19; doc. 51-7). The email explained that MPA's plan to continue production for MBUSI after the thermal event would be in a facility in China, that once the tools to produce cross-car beams were sent to China they would "likely never come back to the" United States, and that MBUSI would "be responsible to cover transportation cost[s] . . . from China." (Doc. 51-7 at 2). None of this information establishes that MBUSI faced financial distress. This email does not provide the cost of the tools, potentially losing the tools, nor the transportation costs. Certainly, both complications would increase costs for MBUSI, but increased costs do not inherently establish financial

distress. Without evidence of how the loss of tools and transportation costs would affect MBUSI's coffers, the email does not create a dispute of fact about whether MBUSI suffered financial distress because of MPA's actions.

MBUSI also cites to an email from Dr. Klaus Zehender, an executive vice president for Mercedes-Benz Werk Sindelfingen in Germany, to someone at MPA. (Doc. 53 at 11, 18–19; doc. 51-8). Dr. Zehender indicates in his email that the MPA timeline to begin producing cross-car beams for MBUSI "is not acceptable since it forces [MBUSI] to stop production for more than 5 weeks." (Doc. 51-8 at 2). This is nothing more than an opinion about production delay by an executive vice president of a different entity. Even assuming Dr. Zehender's opinion is accurate, this testimony establishes that MBUSI would lose money, not that it was facing severe financial distress. Losing money is not the same as a "serious financial hardship," *Whilden*, 469 So. 2d at 563, that would put MBUSI in a "special, unusual, or extraordinary situation[]," *Clark*, 592 So. 2d at 567. MBUSI has not cited to any evidence that the five-week production delay crosses the line from decreased profits to one that could establish a claim for economic duress.

On page twenty-one of the Plaintiffs' brief, within their argument about financial distress, the Plaintiffs cite to a deposition of an MPA employee where the employee speculated that shutting down a car manufacturing plant could be expensive. (Doc. 51-3 at 23; *see* doc. 53 at 21). Speculation regarding an essential

element of a party's claim "does not create a *genuine* issue of fact; instead, it creates a false issue." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quotation marks omitted). And as previously explained, just because something is expensive does not mean it causes financial distress. After considering all evidence Plaintiffs cite to regarding the financial impact of MPA's actions on MBUSI, the court finds no evidence that any extra expenses MBUSI suffered caused MBUSI serious financial hardship. Thus, the court must grant MPA's motion for summary judgment limiting any damages MBUSI can recover from MPA to one million dollars.

MBUSI and HDI argue that even if the partial release binds MBUSI, it does not bind HDI as MBUSI's insurer. (Doc. 53 at 25-26). HDI argues it is not bound by the post-loss purchase order because under Alabama law, "an insurance company's right to subrogation is lost as against a wrongdoer who, without notice of the insurer's rights, settled with and was released from liability by the insured." (*Id.* at 25) (citing *Com. Union Ins. Co. v. Blue Cross & Blue Shield of Ala.*, 540 So. 2d 1368, 1370 (Ala. 1989)). HDI asserts that MPA had constructive notice of its rights as MBUSI's insurer because MPA is a sophisticated entity and thus must know that MBUSI would be "filing a claim with its own insurer and that the carrier would become subrogated to any payment." (*Id.*). MPA argues that there is no evidence that it had actual notice of HDI's rights as MBUSI's insurer and that there is no legal

14

support for HDI and MBUSI's contention that constructive notice is sufficient. (Doc. 58 at 12–13).

The court finds that MPA, as a sophisticated entity, can be deemed to have constructive notice of how insurance companies operate. And contrary to MPA's suggestion, a wrongdoer's constructive notice of an insurer's rights to subrogation can be enough to preserve those rights after the execution of a liability release. *See Comm. Union Ins. Co.*, 540 So. 2d at 1370 ("[I]f [a] tortfeasor has notice <u>or knowledge</u> of the insurer's rights as subrogee at the time the release is executed by the insured, that release will be regarded as subject to the rights of the insurer-subrogee.") (emphasis added and quotation marks omitted). If MPA's constructive notice of HDI's rights as an insurer constitutes knowledge of those rights, the partial release in the post-loss purchase order would be subject to HDI's rights. Thus, MBUSI and HDI have established there are questions of material fact as to whether HDI's subrogation rights are subject to the post-loss purchase order.

In its reply, MPA makes two additional arguments to establish that HDI's subrogation rights are subject to the post-loss purchase order. (Doc. 58 at 11–13). First, MPA asserts that HDI has not met its burden under Federal Rule of Civil Procedure 56(c)(1) to present any evidence that it is a proper subrogee in this matter. (*Id.* at 11). Second, MPA claims that even if HDI is a subrogee in this action, HDI had no rights at the time of the execution of the partial release because HDI had not

paid a claim by MBUSI at the time the post-loss purchase order was executed. (*Id.* at 11–12).

As to its first argument, MPA has not met its burden at summary judgment as the movant to establish that there is no dispute of fact about whether HDI is a proper subrogee because it has offered no evidence to dispute that assertion. MBUSI and HDI's complaint alleges that HDI is a proper subrogee in this matter. (Doc. 1-1 at 8 ¶¶ 29–30). Thus, if MPA sought to disprove that assertion, it would need to offer evidence that establishes HDI is not a proper subrogee. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [evidence in the record] which it believes demonstrate[s] the absence of a genuine issue of material fact.").

For MPA's second argument, it is correct that under Alabama law, "[b]efore subrogation or substitution can be decreed, or the right thereto declared to exist, the insurer must have paid the insured his loss according to the contract." *Lady Corinne Trawlers, Inc. v. Zurich Ins. Co.*, 507 So. 2d 915, 918 (Ala. 1987) (cleaned up). Before an insurer pays the insured for any loss the insured suffered, the insured is the owner of any claim against an alleged wrongdoer. *Id.* If an insured enters into an agreement with an alleged wrongdoer to limit the wrongdoer's liability before the insurer pays for and therefore owns the claim against the wrongdoer, the insured can

16

only later transfer to the insurer what the insured itself owns at the time of the transfer—the limited right to recover subordinate to the insured's agreement with the alleged wrongdoer. *Id.* So if MPA can establish that HDI paid MBUSI's insurance claim after MBUSI agreed to the post-loss purchase order, the partial release in the purchase order also binds HDI.

But MPA fails to cite to any evidence in the record for its proposition that HDI did not pay MBUSI for any loss suffered until after the execution of the post-loss purchase order. (Doc. 47 at 9 n.5; doc. 58 at 12). Again, because MPA did not meet its burden as the movant to bring forth evidence establishing when or if HDI paid MBUSI for its loss suffered, the court will not grant summary judgment on these grounds. *See Celotex Corp.*, 477 U.S. at 323. Because HDI established a question of material fact about whether its subrogation rights are subordinate to MBUSI and MPA's post-loss purchase order, the court **DENIES** MPA's motion for partial summary judgment on the issue.

Because the parties agree that the partial release limits MPA's potential liability to one million dollars, and MBUSI was unable to establish that it suffered financial distress because of MPA's actions, the court **GRANTS** MPA's partial

motion for summary judgment as to MBUSI. (Doc. 45). Any damages that MBUSI could recover from MPA are capped at one million dollars.[1]

Further, the court **DENIES** MPA's request for attorney's fees in association with the filing of its motion for summary judgment. (Doc. 47 at 13). MPA presented no argument as to why it would be entitled to attorney's fees, it simply stated that it was. (*See id.* at 3, 13). Because MPA failed to brief why it would be entitled to attorney's fees, the court will not address this argument. *See Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) ("[B]rief[s] must include an argument containing appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (arguments that are not "briefed before the court" are forfeited and will not be addressed); *United States v. Campbell*, 26 F.4th 860, 871–72 (11th Cir. 2022).

### 2. Inteva's Motion for Summary Judgment

MBUSI and HDI have brought a breach of contract claim and a claim for contractual indemnity against Inteva for failing to timely supply MBUSI with cockpits after the thermal event at MPA's facility and failing to indemnify MBUSI for its losses due to the thermal event. (Doc. 1-1 at 9–11). Inteva moves this court to

---

[1]     In its response brief, MBUSI argues in the alternative that the court should cap recovery at one million dollars, not at the amount MPA's insurance carrier eventually pays MPA for the claim. (Doc. 53 at 24). Because MPA only requests that the court limit liability to one million dollars (doc. 58 at 13 n.13), the court need not address this argument.

enter summary judgment in its favor for two reasons, and in the alternative, moves this court to enter partial summary judgment limiting any damages MBUSI and HDI could recover against it to one million dollars. (Doc. 43). First Inteva claims that its performance under MBUSI and Inteva's contract is excused under the Force Majeure provision in the Master Terms and under the impracticability doctrine under Ala. Code § 7-2-615. (Doc. 48 at 17). Alternatively, Inteva argues that its liability to MBUSI and HDI should be limited by the post-loss purchase order because Inteva was a "Supplier" and intended beneficiary under the purchase order or because Inteva is a third-party beneficiary to the agreement. (*Id.* at 7–8, 17).

### a. Was the thermal event a Force Majeure event?

Inteva contends that its performance obligations under MBUSI and Inteva's contract were excused following the thermal event at MPA's facility because the event constituted a Force Majeure event under the parties' contract. (Doc. 48 at 17–23). MBUSI argues that the court should not grant summary judgment on this issue because there are material factual disputes as to whether the thermal event qualifies as a Force Majeure event. (Doc. 52 at 18–22).

The parties define a Force Majeure event as:

> Any default or delay of performance under the Agreement which is (a) beyond the control of [Inteva], and (b) not occasioned by the fault or negligence of [Inteva], and (c) which results from . . . fires . . . or other natural or governmental causes, which shall not, however, include (x) non-performance by [MPA], . . . for reasons other than a Force Majeure Event applying [MPA].

(*Id.* at 7). Conditions (a), (b), and (c) must be met for an incident to be a Force Majeure event. (Doc. 48 at 20; doc. 52 at 19). Inteva maintains that the thermal event at MPA meets all three requirements. (Doc. 48 at 20). MBUSI concedes that Inteva did not cause the thermal event at MPA's facility but contends there are questions of fact remaining before the court can decide whether conditions (a) and (c) were met. (Doc. 52 at 19).

Inteva argues that the thermal event satisfied condition (a) of the parties' definition of a Force Majeure event because MBUSI instructed Inteva to purchase its cross-car beams from MPA, it was not allowed to select another manufacturer to create the cross-car beams. (Doc. 48 at 20–21). Further, Inteva offers deposition testimony explaining that it did not visit or inspect MPA's facility because MPA was a directed supplier and that if MPA was not a directed supplier, Inteva would have visited MPA's facility. (*Id.* at 21) (citing doc. 44-13 at 7). MBUSI argues that MPA was not using safe practices while producing the cross-car beams and oversight by Inteva could have led to discovery and resolution of these practices—either through Inteva addressing concerns with MPA or relaying concerns to MBUSI—before the thermal event occurred. (Doc. 52 at 20).

That Inteva did not select MPA as its cross-car beam supplier is not dispositive of whether the thermal event was beyond Inteva's control. Even though Inteva could not have selected another—potentially safer—supplier of cross-car beams, it is

possible that Inteva could have impacted MPA's production processes to prevent the thermal event. This conclusion is further supported by the deposition testimony that Inteva did not visit or inspect MPA's facility prior to the thermal event. That testimony does not operate to establish that Inteva could not have exerted control over the thermal event at MPA's facility—the evidence operates to establish that Inteva did not make any attempts to do so. Inteva cannot claim that something is beyond its control simply because it did not try to control it.

In its reply, Inteva argues that the question of whether it had control over the thermal event is a high standard that cannot be met here. (Doc. 56 at 6–7). Inteva defines control as "to exercise restraining or directing influence over." (*Id.* at 6) (citing *U.S. Dep't of Labor v. Tampa Elec. Co.*, 38 F.4th 99, 102 (11th Cir. 2022)). And because the Force Majeure Clause requires control, not foreseeability, there is no genuine dispute that Inteva did not have control over MPA's facilities. (*Id.* at 6–7).

But Inteva's interpretation of the Force Majeure clause's condition (a) is unduly limiting. Condition (a) requires that the event in question be "beyond the control" of Inteva, not that Inteva did not have a "direct[] influence over" the event. (Doc. 56 at 6). There is a fundamental difference between asking whether Inteva could have done something to prevent the thermal event (how the court interprets

condition (a)) and if Inteva directly impacted whether the thermal event would occur (how Inteva seems to interpret condition (a)).

Because the court agrees that questions of material fact exist as to whether the fire at MPA's facility was beyond the control of Inteva, the court will not grant Inteva's motion for summary judgment on the grounds that its performance was excused under the parties' Force Majeure Clause. As condition (a), (b), and (c) must be satisfied for the Force Majeure Clause to apply, the court need not address the parties' arguments regarding condition (c). (*See* doc. 44-6 at 7; doc. 52 at 19; doc. 48 at 20).

Inteva and MBUSI also dispute, assuming that the thermal event was a Force Majeure event, whether Inteva fulfilled its contractual obligations in the face of a Force Majeure event. (Doc. 52 at 22–23; doc. 56 at 8). But because the court finds that factual questions exist as to whether the thermal event was a Force Majeure event, the court need not decide whether Inteva fulfilled its contractual obligations assuming the thermal event was a Force Majeure event.

### b. Does the impracticability doctrine under Alabama law excuse Inteva's performance under the contract?

Next, Inteva argues that its performance after the thermal event at MPA's facility was excused under Alabama common law and Ala. Code § 7-2-615 as impossible or impracticable. (Doc. 48 at 23–26). For its argument under the common law, Inteva cites to three cases that acknowledge there could be circumstances where

an impossibility defense to contract excuses delayed performance. (*Id.* at 23–24) (citing *Hunter-Benn & Co. v. Bassett Lumber Co.*, 139 So. 348 (1931); *Alpine Constr. Co. v. Water Works Bd. of City of Birmingham*, 377 So. 2d 954 (Ala. 1979); *Texas Co. v. Hogarth Shipping Co.*, 256 U.S. 619 (1921)). As explained by MBUSI (doc. 52 at 24), Alabama common law has since expressly declined to recognize impossibility as a defense to contract execution, *Silverman v. Charmac*, 414 So. 2d 892, 894 (Ala. 1982) ("[T]his Court has not recognized the defense of impossibility or impracticability."); *see also Ala. Power Co. v. Harmon*, 483 So. 2d 386, 390 (Ala. 1986). Thus, Inteva's argument that a common law impossibility defense applies here is not valid.

Inteva then argues that the thermal event at MPA's facility caused its performance under its contract with MBUSI to be impracticable, and thus should be excused under Ala. Code § 7-2-615. (Doc. 48 at 24). In relevant part, the code section provides that unless a seller "assumed a greater obligation" under the parties' contract, "[d]elay in delivery . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." Ala. Code § 7-2-615(a). For the section to apply, "[t]he seller must notify the buyer seasonably that there will be delay or nondelivery" of the contracted goods and if the contingency that makes delivery impracticable "affects

only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers . . . in any manner which is fair and reasonable." *Id.* § 7-2-615(b)–(c).

In opposition to the application of § 7-2-615, MBUSI first argues that Inteva assumed a greater obligation than provided in the statute because it agreed to the Force Majeure Clause of the Master Terms which provides a limited number of scenarios where impracticable performance is excused. (Doc. 52 at 25–26; *see* doc. 44-6 at 7). Second, MBUSI asserts that the thermal event was not a contingency that neither MBUSI nor Inteva anticipated under their contract because the parties' obligations in case of a fire were defined within the Force Majeure Clause of the Master Terms. (Doc. 52 at 26; doc. 44-6 at 7). Finally, because the Master Terms required Inteva to acquire insurance policies that named MBUSI as an additional insured, the parties' contract provided that in the case of an occurrence prohibiting performance, risk of loss was allocated to Inteva. (*Id.* at 26–27).

In diversity cases, "the substantive law of the forum state applies." *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir. 1982). In determining the law of the forum state, "federal courts must follow the decisions of the state's highest court, and in the absence of such decisions on an issue, must adhere to the decisions of the state's intermediate appellate courts." *Id.* If no appellate court in a state has decided an issue, "a federal court [may] make an educated guess as to how that state's

supreme court would rule." *LaFrere v. Quezada*, 582 F.3d 1260, 1264 (11th Cir. 2009) (quotation marks omitted).

No court has interpreted Ala. Code § 7-2-615. *Cf. Silverman v. Charmac, Inc.*, 414 So. 2d 892, 894 (Ala. 1982) (citing Ala. Code § 7-2-615 without further explanation); *Drummond Coal Sales, Inc. v. Sequoia Energy, LLC*, No. 2:08-cv-01356-HGD, 2009 WL 10703295, at *2–3 (N.D. Ala. 2009) (same). And this court is not required to make an educated guess about the Alabama Supreme Court's interpretation of the statute today because Inteva failed to offer any evidence that the thermal event at MPA was a contingency the nonoccurrence of which was a basic assumption on which the contract was made. (Doc. 48 at 25). Instead, Inteva's only argument is provided without support and quoted in full here: that the thermal event was "an occurrence not anticipated by either Inteva or MBUSI." (*Id.*). While the contours of § 7-2-615 remain hazy, undoubtedly some evidence must be provided to establish an event was not contemplated by the parties when drafting their contract. *See Stein v. Ala. Sec'y of State*, 774 F.3d 689, 692 (11th Cir. 2014) ("The party moving for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion. This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.") (cleaned up).

  c. *Is Inteva a party or beneficiary under MPA and MBUSI's post-loss*
   *purchase order?*

Finally, Inteva argues that if the court does not grant summary judgment in its favor on its other arguments, the court should limit any damages MBUSI or HDI could recover from Inteva under the post-loss purchase order. (Doc. 48 at 26–34). Inteva first contends that it was a party to MBUSI and MPA's discussions regarding production capacity after the thermal event and thus even though it is not explicitly mentioned in the post-loss purchase order, it is referenced as a "Supplier" and the partial release in the post-loss purchase order should therefore apply to it. (*Id.* at 26–32). Inteva then asserts that even if the court finds it was not a "Supplier" under the post-loss purchase order, it is still a third-party beneficiary of the order that should benefit from the partial release. (*Id.* at 32–34).

  Unless a contract is ambiguous, it should be enforced as written. *Doster Const. Co., Inc. v. Marathon Elec. Contractors, Inc.*, 32 So. 3d 1277, 1283 (Ala. 2009). Under Alabama law, whether a contract is ambiguous is a question of law. *FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc.*, 914 So. 2d 344, 357 (Ala. 2005). A provision in a contract is ambiguous, "if it is reasonably susceptible of more than one meaning." *Id.* If the contract can be reasonably interpreted only one way, "then the court will presume that the parties intended what they stated and will enforce the contract as written." *Once Upon a Time, LLC v. Chappelle Props., LLC*, 209 So. 3d 1094, 1097 (Ala. 2016) (quotation marks omitted).

26

Inteva argues that because it is a "Supplier" under the Master Terms (doc. 44-6 at 10; *see* doc. 52 at 6), which are explicitly incorporated into the post-loss purchase order, it is also a "Supplier" throughout the post-loss purchase order (doc. 48 at 27–32; doc. 44-12 at 2). And in relevant part, the post-loss purchase order provides that: "Supplier shall have no liability to MBUSI for the thermal event for any amount in excess of an amount equal to the contractual penalties coverage limit of the Supplier's insurance policy." (Doc. 44-12 at 4). Thus, if Inteva is a "Supplier" under the post-loss purchase order, it is entitled to benefit from the partial release limiting liability to MBUSI for the thermal event to one million dollars.

MBUSI does not dispute that Inteva is a "Supplier" under the Master Terms. (Doc. 52 at 6). Instead, MBUSI argues, and the court agrees, that the post-loss purchase order does define what entities should be considered a "Supplier," and that definition does not include Inteva. (*Id.* at 28). The heading of the post-loss purchase order indicates that MPA (and only MPA) is the recipient of the order and thus its employees are the intended readers. (*See* doc. 44-12 at 2). The first sentence of the order provides that: "This Purchase Order for reservation of capacity is a binding contract between you ('Supplier') and Mercedes-Benz U.S. International, Inc. ('MBUSI') and is subject to, and made a part of, the Master Terms Direct Purchasing, version November 2015, (the 'Agreement')." (*Id.*). Clearly, when "Supplier" is defined as "you," it means the intended recipient—here, MPA and its

employees. Thus, because "Supplier" is unambiguously defined in the post-loss purchase order to exclude Inteva, Inteva cannot be considered a "Supplier" and benefit from the partial release.

Inteva asserts that even if the court finds that the post-loss purchase order defines the term "Supplier" to exclude Inteva, the Master Terms "provide that where there is any conflict between a purchase order or the Master Terms, the Master terms shall prevail." (Doc. 48 at 28–29) (quotation marks omitted). Thus, regardless of whether the post-loss purchase order defines "Supplier," the definition provided in the Master Terms must control. (*Id.*).

Even if the court found that the Master Terms' definition of "Supplier" was relevant here, that Inteva is a "Supplier" to MBUSI for products under some contract does not mean that Inteva is a "Supplier" of the product described in the post-loss purchase order. The Master Terms' definition of a "Supplier" requires that an entity "agree[] to supply [a] Product to MBUSI in accordance with the Contract Documents." (Doc. 44-6 at 10). Although Inteva has agreed to supply MBUSI with a product—cockpits for three of its car models—that promise is in a separate contract between Inteva and MBUSI. (Doc. 44-4 at 2–5). Inteva makes no such promises in the post-loss purchase order. (*See* doc. 44-12). The "Product" in the post-loss purchase order is MPA's guarantee to reserve capacity at its facility to produce a certain number of cross-car beams for MBUSI per week. (*Id.* at 2–3). Inteva is not

the entity providing this "Product." Thus, even if the Master Terms' definition of "Supplier" applied to the post-loss purchase order, Inteva would not qualify.

Inteva also argues that even if it is not a "Supplier" as provided in the post-loss purchase order, it is a third-party beneficiary of the post-loss purchase order. (Doc. 48 at 32–34). Under Alabama law, a party claiming to be a third-party beneficiary of a contract "must establish that the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental, benefit upon the third party." *Jenkins v. Atelier Homes, Inc.*, 62 So. 3d 504, 512 (Ala. 2010) (quotation marks omitted).

Here, as MBUSI argues, Inteva has not shown that MBUSI and MPA intended to confer a benefit onto Inteva when executing the post-loss purchase order. (Doc. 52 at 31). Inteva attempts to use the parties' responsibility matrix to show that any agreement between MBUSI and MPA would always benefit Inteva, so the post-loss purchase order conferred third-party beneficiary status on Inteva. (Doc. 48 at 33–34). This argument does not pass muster because MBUSI and MPA can enter into a contract that they know will benefit Inteva without intending for the contract to benefit Inteva. *See Keebler v. Glenwood Woodyard, Inc.*, 628 So. 2d 566, 569 (Ala. 1993). Without evidence of MBUSI and MPA's intent to confer a benefit on Inteva by entering into the post-loss purchase order, Inteva cannot be a third-party beneficiary to the order.

Accordingly, the court **DENIES** Inteva's motion for summary judgment against MBUSI and HDI.

### III.   CONCLUSION

The court **GRANTS IN PART** and **DENIES IN PART** MPA's motion for summary judgment. (Doc. 45). The court **ENTERS SUMMARY JUDGMENT** in favor of MPA on its request to limit any damages recoverable by MBUSI from MPA to one million dollars. The court **DENIES SUMMARY JUDGMENT** in favor of HDI on MPA's request to limit any damages recoverable by HDI to one million dollars.

The court **DENIES** Inteva's motion for summary judgment. (Doc. 43).

**DONE** and **ORDERED** this June 22, 2023.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE

30